# Exhibit A

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SEAN DOYLE et al., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL EXPRESS CORPORATION, successor by merger to FEDEX GROUND PACKAGE SYSTEM, INC., <br><br> Defendant. | Case No.: 3:24-cv-12030-MGM |

**DECLARATION OF JESSICA G. SCOTT IN SUPPORT OF FEDERAL EXPRESS CORPORATION'S MOTION FOR RULE 11 SANCTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

I, Jessica G. Scott, declare and state as follows:

1. I am a partner at the law firm of Wheeler Trigg O'Donnell LLP. I am over 21 years of age, and I have personal knowledge of the matters stated in this declaration. If asked to testify, I would be competent to testify to these matters.

**Pertinent Background in the *Roy* Case**

2. I have been counsel of record for Federal Express Corporation, successor by merger to FedEx Ground Package System, Inc., ("FedEx") in the above captioned case since its inception as well as in *Roy v. FedEx Ground Package System, Inc.*, No. 3:17-cv-30116-KAR (D. Mass.) ("*Roy*"), since 2019, until its resolution in 2024. I have also been counsel of record in *Claiborne v. FedEx Ground Package System, Inc.*, No. 2:18-cv-01698-RJC (W.D. Pa.) ("*Claiborne*"), since its inception.

3. In the *Roy* case, FedEx was entitled to seek discovery from 50 opt ins it chose. The parties also agreed to seek mutual discovery for an additional 50 opt-ins chosen by LLR.

4. In February 2020, FedEx sent questionnaires for an initial nine opt-ins. Four of those nine opted out or were dismissed with prejudice from the case.

5. In May 2020, FedEx sent out questionnaires to 13 opt-ins. Seven of those opt-ins opted out or were dismissed with prejudice from the case.

6. FedEx sent questionnaires to 28 opt-ins in June 2020, and of those, 20 ultimately opted out or were dismissed with prejudice from the case.

7. In September 2020, FedEx sent questionnaires to 10 opt-ins, all of which either opted out or were dismissed with prejudice from the case.

8. FedEx sent out another 49 questionnaires in December 2020, and 10 of those opt-ins opted out or were dismissed with prejudice from the case.

9. In March 2021, FedEx sent out another 15 questionnaires, four of which opted out or were dismissed with prejudice from the case.

10. In total, FedEx sent questionnaires to 129 opt-ins, 52 for which it never received a response.

11. By decertification in early 2024, FedEx had received only 60 "complete" questionnaire responses from the total 129 discovery questionnaires it had issued, and only 34 of those 60 produced any documents at all. FedEx received "complete" responses from only 36 of the opt-ins it selected itself (as opposed to the opt-ins Plaintiffs' counsel selected), despite issuing dozens of questionnaires to alternate opt-ins. The use of the word "complete" for these purposes simply means the person filled out the questionnaire and produced documents they said they had, if any; however, most said they didn't have any documents anymore, that they were no longer driving, and, therefore, produced little to nothing.

12. Where FedEx did receive responses to the questionnaires, even partial ones, those responses took many months to receive.

13. Based on FedEx's preliminary investigation, it appears that all 38 Plaintiffs were discovery opt-ins in *Roy*. FedEx never received a discovery questionnaire response from two of those Plaintiffs, however: Luke Scarbrough and Christopher Cantin.

14. During discovery in *Roy*, opt-in, now-Plaintiff, Antonio Barros, produced W-2s from 2019 through 2021, and paystubs from 2018 to 2022. According to FedEx's Department of

Transportation scanner data, however, Barros was a current driver at least through August 18, 2023, when FedEx filed its motion for decertification.

15. During discovery in *Roy*, opt-in, now-Plaintiff, Diana Fowler, produce W-2s from 2016 through 2018, and paystubs from 2015 to 2019. According to FedEx's Department of Transportation scanner data, Ms. Fowler drove through 2021.

16. Despite both Named Plaintiffs, Jordan Roy and Justin Trumbull, bringing the *Roy* lawsuit very shortly after their termination from their employer, Up from the Ground, Inc., neither produced documents they should have had in their possession. Roy did not produce any pay documents at all. Trumbull produced only a handful of pay stubs.

17. During discovery in *Roy*, opt-in, now-Plaintiff, Paul Odierno did not produce any documents.

18. FedEx produced scanner data for Roberto Ayala-Robles in *Roy*, which shows that he drove only in 2015.

19. FedEx produced scanner data for Eric Flowers in *Roy*, which shows that he drove only through 2016.

20. During discovery in *Roy*, FedEx deposed 17 of the 38 now-Plaintiffs.

21. FedEx produced pay documents it received from Sean Doyle's Service Provider, JEP Distribution Inc., which show that he was paid overtime beginning on December 29, 2020.

22. FedEx produced pay documents it received from Keith Eddington's Service Provider, JEP Distribution Inc., which show that he was paid overtime beginning on May 11, 2018.

23.     There was only one Roberto Ayala-Robles that opted into *Roy*. FedEx has confirmed there is not another driver with the same name that drove in the state of Massachusetts that could somehow explain this discrepancy.

24.     During the entirety of *Roy*, LLR did not request pay or hours-worked documents from any Service Providers, apart from the six opt-ins for which the Court ordered it to do so. LLR did not request this information from the Service Provider that employed the two named Plaintiffs, either informally or through court process, like a subpoena.

**Communications with LLR Regarding This Case (and the Other New Cases)**

25.     On July 10, 2024, a few weeks before filing this case and the other new cases, Ms. Liss-Riordan called me to discuss whether FedEx was interested in mediating towards a "global resolution" because LLR was getting ready to file claims on behalf of "many thousands" of individual plaintiffs.

26.     Ms. Liss-Riordan further stated that maybe my client wants to consider sitting down and having a discussion about a global resolution "or we can have fun together for the next 10 years or more."

27.     I informed Ms. Liss-Riordan that I would speak with my client, but that what she was proposing was essentially a class settlement and that my client had never been willing to consider that before. I said we have no clue how these "many thousands" were paid by their Service Providers.

28.     Ms. Liss-Riordan stated that the parties could mediate based on "data" regarding these individuals. I asked whether that included pay information. I said, you're filing these claims on behalf of these people that have to prove their claims, so I assume you will be

4

collecting their pay information. Ms. Liss-Riordan dodged the question about obtaining and providing pay information.

29. Before concluding the call, Ms. Liss-Riordan again referenced "having fun" litigating against each other for the next 10 years if there was to be no global resolution.

**Documents from Internet Searches**

30. Attached to FedEx's Rule 11 Memorandum as Exhibit H is a true and correct copy of a public Facebook post by Cassandra Miller, a named Plaintiff in the *Abner* case, that was located by conducting internet searches, under my supervision and direction, to try to determine what LLR said to former opt-ins about refiling their claims.

31. Attached to FedEx's Rule 11 Memorandum as Exhibit I is a true and correct copy of a public Facebook post by Harold Hall, a named Plaintiff in the *Abner* case, that was located by conducting internet searches, under my supervision and direction, to try to determine what LLR said to former opt-ins about refiling their claims.

32. Attached to FedEx's Rule 11 Memorandum as Exhibit J is a true and correct copy of a form on LLR's website that was located, under my supervision and direction, after clicking the link in Harold Hall's public Facebook post (Ex. I).

**Additional Email Exchange**

33. On October 24, 2024, I traveled to LLR's office to take the deposition of their data analyst who had provided a declaration and damages calculations for each of the 12 plaintiffs in *Claiborne*. The significant and substantial errors in her calculations and misuse of documents and data produced for these plaintiffs became apparent so early in the deposition that

the parties agreed to stop the deposition so that LLR could have the entire report and damages calculations redone.

34.  In the aftermath, Ms. Liss-Riordan, by email, began to blame FedEx for the errors in LLR's data analyst's report as the plaintiffs' "joint employer" that should have kept records (obviously an issue that is hotly contested). Ms. Liss-Riordan stated that they made "reasonable estimates based upon a ridiculous amount of data to have to go through to calculate employees' pay. . . ." A true and correct copy of excerpts of that email exchange is attached as Exhibit K to FedEx's Rule 11 Memorandum.

35.  This "ridiculous amount of data" was simply paystubs the plaintiffs had produced (none of whom produced complete sets), the plaintiffs' depositions, and the summary scanner and vehicle data LLR had requested from FedEx, for just 12 plaintiffs.

I declare under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, in Denver, Colorado.

_____
Jessica G. Scott